## KALLE & CO. et al. v. MULTAZO CO., Inc.

### No. 7996.

Circuit Court of Appeals, Sixth Circuit.

Jan. 10, 1940.

Rehearing Denied April 8, 1940.

See 110 F.2d 814.

---

Arthur C. Denison, of Cleveland, Ohio, and Arthur W. Dickey, of Detroit, Mich. (Harness, Dickey & Pierce and Arthur W. Dickey, all of Detroit, Mich., Arthur C. Denison, of Cleveland, Ohio, and Werner H. Hutz and Leslie G. Noller, both of New York City, on the brief), for appellants.

Ralph L. Chappell, of Kalamazoo, Mich. (Ralph L. Chappell and Earl & Chappell, all of Kalamazoo, Mich., on the brief), for appellee.

Before SIMONS, ALLEN, and HAMILTON, Circuit Judges.

SIMONS, Circuit Judge.

In this patent infringement suit are involved alleged advances in the art of producing copy paper upon which positive copies of engineering drawings and the like can be reproduced by light directly from the originals. The patents alleged to be infringed are No. 1,628,279 granted May 10, 1927, to Schmidt and Krieger, and patent No. 1,803,906 granted May 5, 1931, to Krieger and Zahn. Since the patents in suit are identified in the briefs and record by the first two digits of their numbers, they will be referred to herein as the "16" and "18" patents. The "16" patent being for an alleged improvement in the process and product of patent No. 1,444,469 issued February 6, 1923, to Kogel and Neuenhaus, which is of great importance in delineating prior art, the latter will be referred to as the "14" patent.

The art to which all three patents relate makes use of azo dyes in reproducing copies by a process through which positive reproductions are made directly, rather than through the instrumentality of an intermediate negative, as in photography. A positive copy is one in which the lines are the same as in the original with respect to their contrast with the background, and so is distinguished from a blueprint or a Van Dyke print.

The copy papers which are the subject matter of the patents are known as diazotypes, and the method of producing prints thereon is well described in the opinion of the court below, 31 F.Supp. 109, and in van der Grinten et al. v. Dieterich-Post Co., 9 Cir., 85 F.2d 637. It is sufficient here to say that the lines and figures of

the original are reproduced positively in the copy through the reaction of two chemical compounds,—one a diazo compound and the other the azo dye already mentioned. The reaction is called "coupling." Two kinds of diazo-type papers were known to the art, namely, the single component paper and the two component paper. In respect to coupling, however, the chemical reaction is much the same in each. In the two component papers with which we are here concerned, the diazo compound and the azo coupling component are coated together upon one side of the copy paper and are caused to react to form a colored dye which reproduces the original drawing. This is made possible by the fact that the diazo compound is sensitive to light and is decomposed when subjected to it. When the diazo-type copy paper is exposed, as in making blueprints, so much of the diazo compound as is protected by the lines of the tracing will remain undecomposed. It is then permitted to couple with the azo dyestuff by neutralizing the acid used to retard coupling and the azo dye reproduces the lines of the tracing. The acid is neutralized usually by an ammonia gas. In single component papers, the diazo compound alone is coated upon the paper before printing. Thereafter it must be subjected to a liquid developing bath containing the dyestuff. This causes a distortion and shrinking of the paper when it is dry and produces a less accurate copy than paper not requiring development in a liquid bath. The advantages of the two component papers over the single component papers are, therefore, obvious, and were understood in the art.

The "14" patent taught reproduction of positive copies by the use of chemical compounds known as diazo anhydrides and azo coupling components for two component papers. The "16" patent, it is asserted, teaches the use of chemical compounds other than those described in the "14" patent. These are known as amino diazo compounds, but they are likewise used with azo coupling components. Of the claims of the "16" patent allowed to the inventors, process claims 1 and 2 and product claims 4 and 7 are in suit. They are:

"1. Process for producing sensitive layers on a suitable base, consisting in covering the base with a diazo compound being formed from amino compounds containing at least one other amino group and an azo dyestuff component.

"2. Process for producing sensitive layers on a suitable base, consisting in covering the base with a diazo compound being formed from amino compounds containing at least one other amino group, an azo dyestuff component and a metal salt."

"4. As new products, sensitive layers on a suitable base, consisting of diazo compounds being formed from amino compounds containing at least one other amino group, and an azo dyestuff component."

"7. As new products, sensitive layers on a suitable base, consisting of diazo compounds being formed from amino compounds containing at least one other amino group, an azo dyestuff component and a metal salt."

The District Court held the claims of the "16" patent in suit to be invalid. Decision was based apparently on a number of grounds. It was thought that the specification led unmistakably to an inference that the fundamental object of the "16" patent was to teach a process for production of and to produce a paper equally or nearly as durable and as capable of being stored as that described in the "14" patent, without having to add a considerable quantity of acid, and that this could be accomplished by using as diazo components compounds which might be regarded as diazo-anhydrides, but which were diazo compounds formed from amino compounds and containing at least one other amino group. The court was led to its conclusion by a reference in the patent to the effect of sulphuric acid in impairing the durability of the paper fibre, and an assertion that less acid was needed to prevent coupling if the amino-diazo compounds disclosed in the patent were used. Since the record discloses that sulphuric acid may not commercially be used, and that of the weaker acids considerable quantities are required to prevent premature coupling, it was evidently considered that the claims in suit were inoperative.

It was also thought, though not categorically so stated, that the claims lacked invention since the "14" patent taught the use of the diazo-anhydrides and an article by Ruff and Stein showed the necessity of an alkalizing medium for coupling, and the excellent light-sensitiveness of the diazo of aminocarbazol. Even though there was evidence that an organic chemist would not have been led immediately to the idea that he could replace the diazo-anhydride of the "14" patent with an amino

diazo anhydride, the court thought it altogether likely that a chemist skilled in the art of producing diazo-type papers and familiar with the teaching of the "14" patent and the Ruff and Stein article, would encounter no substantial difficulty in making the replacement and could have foretold that the amino diazo compounds would possess not only the desired light-sensitiveness, stability and bleaching property, but the variety of colors thought by the inventors to be of such great advantage.

Finally the patent was thought invalid for lack of sufficient disclosure to comply with the requirements of R.S. Sec. 4888, 35 U.S.C. § 33, 35 U.S.C.A. § 33. The record fairly discloses that unless a diazo compound formed from an amino compound containing at least one other amino group has also the quinonoid or anhydride structure, it is not suitable for use in diazo type papers. Since the claims as written are broad enough to include compounds which do not have the anhydride or quinonoid structure, and the court was not persuaded by the argument of the appellants that the claims must be limited, in the light of the specification, to amino compounds having the quinonoid or anhydride structure, it concluded that there was failure to disclose the precise scope of the invention.

The inference drawn below that the fundamental object of the "16" patent is to eliminate or reduce the use of acid, is attacked as erroneous in view of the rule that the patent is addressed to those skilled in the art and upon the contention that no one skilled in the art would have thought that premature coupling with amino diazo compounds could be prevented without the use of acid. Since decision in Schriber-Schroth Company v. Cleveland Trust Company, 305 U.S. 47, 573, 59 S.Ct. 8, 83 L.Ed. 34, reversing Cleveland Trust Company v. Schriber-Schroth Company, 6 Cir., 92 F. 2d 330, perhaps great reliance may not safely be placed upon the knowledge of those skilled in the art to supply deficiencies or clarify obscurities in the description and claims of a patent, in respect to an element or the characteristics of an element necessary to the successful functioning of a patented combination. Be that as it may, and without attempting to adjudge the soundness of the court's conclusion that there was lack of invention, we consider the adequacy of disclosure required by Section 4888, since infirmity in this respect is most strongly stressed by the appellee and appears to give appellants much concern. If the decision was sound upon this issue, it will be clear that we need not consider other grounds of invalidity nor the issue of infringement.

The question as already indicated, arises from the fact that the claims are not limited to diazo compounds formed from amino compounds which have the anhydride or quinonoid molecular structure, whereas the evidence indicates that compounds not having such structure are unsatisfactory. So it is contended that the claims are too broad in that they do not precisely define the invention. The patent, it is asserted, discloses a group of compounds from which the public, desiring to avail itself of the invention after the expiration of the monopoly, may select satisfactory compounds only by independent experiment and discovery. The law, of course, is clear that in order to obtain a valid patent the inventor must point out precisely the scope of his invention and the limits of his monopoly. Permutit Company v. Graver Corporation, 284 U.S. 52, 52 S.Ct. 53, 76 L.Ed. 163; Schriber-Schroth Company v. Cleveland Trust Company, supra; A. O. Smith Company v. Petroleum Iron Works Company, 6 Cir., 73 F.2d 531. In response, the appellants urge that claims are to be construed in the light of the specification, and point to the statement in the "16" patent that the compounds there disclosed "may be regarded as diazo-anhydrides in a broad sense and which may be presumed to have been produced from diazonium compounds with elimination of water." They are not compounds of the type disclosed by the "14" patent which are specifically disclaimed. The phrase "may be regarded as diazo-anhydrides in a broad sense, etc." means, they say, that the amino diazo compounds discovered as useful are capable of assuming a molecular structure similar to that of the true diazo-anhydrides of the "14" patent, though they are not true diazo-anhydrides. The anhydride molecular structure is also sometimes called the quinonoid structure, due to the fact that it is the habitual molecular structure of the organic compound quinone. It is a modification of the normal benzene or benzenoid molecular structure involving a rearrangement of the double bonds between the carbon atoms. So while amino diazo compounds may be regarded as diazo-anhydrides, in a broad sense, their

chemical constitution is not the same as that of the true diazo-anhydrides previously disclosed. It is, therefore, the contention of the appellants that they intended to claim only those amino diazo compounds which have or are capable of having the anhydride or quinonoid structure, and that their intention is so clearly demonstrated by the specification that the claims must be read with the limitation, and, so read, are not invalid.

However strongly it may now be urged that the amino diazo compounds of the patent are those only which are capable of assuming molecular structure similar to true diazo-anhydrides and so may be regarded as diazo-anhydrides in a broad sense, and confine the invention to combinations which include only such compounds, the evidence demonstrates quite clearly that a classification is disclosed of which some are useful for the successful practice of the invention, and others are not. So it is impossible to escape the conclusion that additional experimentation is required to determine the limits of the monopoly. As the claims are written, the competitor without independent discovery is excluded from a field to which the inventors have no valid title.

The appellants' expert testified: "The point I wish to make is that if we were to diazotize an amino diazo compound as such without having the quinonoid structure or the diazo-anhydride structure it would be comparable to these materials which have been tried and found not to be satisfactory, as compared to the materials included in the "14" patent in a two component paper, and therefore my answer was that I do not think that any organic chemist, knowing the difference between the quinonoid compounds, would be led immediately to the idea that he could replace the diazi-anhydride with an amino diazo-anhydride." He testified that the diazo of novacaine is a diazo compound formed from an amino compound containing at least one other amino group (and so responding to the classification and claims of the patent), but would not have the quinonoid structure, and also that the quinonoidal structure theory was known at the time of the "16" patent in suit. He was unable to say that all amino diazo compounds that do not have the quinonoid structure are automatically suitable or unsuitable for the type of prints here involved.

Out of a maze of confusing scientific discussion in briefs and record, there yet emerges with reasonable clarity to the understanding imperfectly schooled in chemical science, the fact that the claims as written include as elements in the patented combination all amino diazo compounds, that the characterization of them in the specification as diazo-anhydrides in a broad sense does not so clearly demonstrate an intention to limit the scope of the claims to compounds having the anhydride or quinonoid structure as to require that they be narrowed by construction, since the claims are unambiguous and the quinonoidal structure theory was known at the time the patent was granted, that there is concession that many diazo amino compounds are incapable of taking the anhydride or quinonoid structure, that proof of their unsuitability is persuasive even though the experiments of Erickson were ex parte, since the court found no reason to question his good faith and his conclusions might easily have been disproved if incorrect but were not disproved. The suggestion that the anhydride or quinonoid structure is but a characteristic of certain compounds and that the analogue of appellants' contention is to be found in our second decision in the piston cases (Cleveland Trust Co. v. Schriber-Schroth, 6 Cir., 108 F.2d 109, decided October 6, 1939) where we construed webs of the Jardine patent to be flexible in the light of a specification so describing them, must be rejected, since here as there it is not a mere characteristic of a member of the patented combination that is sought to be imported into the claims, depending on the shape and thickness of metal, but a limitation to compounds of chemical constitution differing from others of a general class therein claimed.

Where within a general classification disclosed by the claims, are compounds which do not answer the description of the specification, even though there be a general quality common to them all, yet if there be no common quality in respect to their effectiveness in achieving the inventive concept, claims for their exclusive use cannot be sustained. Corona Cord Tire Company v. Dovan Chemical Corp., 276 U.S. 358, 385, 48 S.Ct. 380, 72 L.Ed. 610; Metals Recovery Company v. Anaconda Copper Mining Co., 9 Cir., 31 F.2d 100. We find no error in the holding

of the court that the "16" patent is invalid for lack of adequate disclosure.

The record contains a verified copy of the decision of the Supreme Court of Germany sustaining the validity of a German patent corresponding to the "16" patent in suit over defenses similar to those here asserted, including anticipation by a German patent corresponding to the "14" patent. Upon an identical record and subject to the same statutory requirements for full disclosure which control us, the decision of the German Court would undoubtedly be entitled to great respect, especially in an art wherein German experts have long been popularly accorded preeminence. Upon the narrow question, however, upon which we sustain decision below, the German adjudication can be of no aid.

Of the nine claims of the "18" patent, all are in suit. They cover both process and product—claim 1 being typical of the process claims and claim 9 of the product claims. They read:

"1. The process of stabilizing diazo-types which consists in adding to the light-sensitive layer a derivative of thiocarbonic acid."

"9. As new products, diazo-types containing thiourea, being of a great fastness to light."

The inventors of the "18" patent recognized and, by their discovery, claim to have remedied imperfections in the white background of copy papers when exposed to the ammonia gas developer, which in two component papers replaces the liquid bath in a neutralizing alkali. In exposing the diazo compounds to light they produce a derivative of benzene known as phenols. These in developing mar the white background with yellow stains which are undesirable even though they are not sufficient to obliterate the copy. The patentees claim to have discovered that the stains can be avoided by adding thiourea to the light-sensitive coating of the papers.

The court held the "18" patent invalid as showing no invention over van der Grinten No. 1,821,281, in view of the teachings of Moureu. It observed that in van der Grinten it is stated "the invention is based on the observation that the discoloration of the background in all kinds of diazo-type processes can be prevented even for extended periods if a reducing agent is added to the sensitive layer, or during or after development of the picture." The patent lists reducing agents preferably used together with small quantities of the substances with catalytic action defined as "anti-oxygenes" by Moureu. It also recites "if the reducing agents are added to the sensitive layers together with the other constituents, the additional advantage is obtained that the small discoloring effect due to the oxidation of the components of the layer which may occur during long storage of it in the unexposed state is also prevented." The references in the van der Grinten patent to the Moureu articles are: "Chemisch Zentrallblatt, 1922 I. 1317, and Comptes Rendus, 174, pages 258-264, and following."

The appellants at first contended that the Moureu articles, even though they refer to thiourea as an anti-oxygene, are unimportant because they do not point out that the anti-oxygenes listed by Moureu can be employed to prevent oxidation of the phenols found in the light-sensitive layers of diazo-types. The appellees respond that van der Grinten points this out even though Moureu does not, and teaches the art that the anti-oxygenes listed by Moureu can be used for this purpose. Subsequently, by motion to correct an error in the record, the appellants undertake to demonstrate that neither of the Moureu articles referred to in the van der Grinten patent discloses the use of thiourea or of any sulphur compounds as anti-oxygenes, and that the exhibits purporting to do so were not the articles referred to by van der Grinten; that the mistake was not noted by the appellants and so permitted the court to fall into error in stating that Moureu had, in the van der Grinten references, disclosed the use of thiourea as an anti-oxygene of quite general application. The appellees insist, however, that thiourea is disclosed as an anti-oxygene by Moureu even though its characteristic in preventing oxidation of phenols in light-sensitive layers of diazo-types is not specifically indicated, and that the patent plus Moureu, charts a straight course to what is claimed to be the discovery of the inventors which may be followed by any chemist skilled in the art, without the exercise of the inventive faculty.

We think that this is so, notwithstanding the caution that must be exercised in assuming, even in the case of well-known chemical elements, that an expected result will follow from the combination. United Chromium, Inc. v. In-

ternational Silver Co., D.C., 53 F.2d 390, 393. It would seem to us that if van der Grinten does not completely anticipate the claims of the "18" patent in suit, in view of the teachings of Moureu, there is in the "18" patent nothing that rises to the dignity of invention over prior art.

It is suggested that the "18" patent distinguishes from van der Grinten in that it teaches the use of thiourea as an anti-oxygene for the elimination of discoloration in background without association with other elements, whereas van der Grinten teaches the use of reducing agents with but small quantities of anti-oxygenes for catalytic purposes only. If this is so, it would seem to be clear that the appellees follow van der Grinten and so do not infringe. They do not use thiourea alone to eliminate stains resulting from the decomposition of the diazo compound. Indeed, it was long earnestly insisted that no thiourea at all was present in their layer until upon its isolation in the laboratory by the appellants' expert its presence was conceded. We are not persuaded that their explanation of the presence of thiourea as accidental and due to chemical reactions not understood is not made in good faith. At any rate the court found no evidence of willful infringement and made no finding of male fides.

The decree below is affirmed.