**PEMCO PRODUCTS, INC., Appellant,**

v.

**GENERAL MILLS, INC., Appellee.**

No. 13482.

United States Court of Appeals
Sixth Circuit.

Dec. 8, 1958.

Gordon W. Daisley, Washington, D. C. (Charles O. Marshall, Jr., Toledo,

Ohio, Kenneth E. Midgley, Kansas City, Mo., on brief), for appellant.

Charles J. Merriam, Chicago, Ill. (Carl F. Schaffer, Toledo, Ohio, on brief), for appellee.

Before ALLEN, Chief Judge, MARTIN, Circuit Judge, and THORNTON, District Judge.

PER CURIAM.

This appeal attacks a judgment of the District Court finding Claims 2, 7, and 9 of United States Patent No. 2,696,-455, issued on December 7, 1954, to Dr. Harry E. Blair on an application filed May 19, 1952, invalid because the claims are too broad and overclaim the invention, and dismissing the complaint.[1] Plaintiff's action was for infringement, injunction and other relief. The complaint alleged that defendant, by making and selling a feed mix containing a cadmium anthranilate concentrate developed by Dr. James Guthrie for use as a hog anthelmintic, infringed the Blair patent. The defendant asserted, among other things, invalidity of the claims in issue and noninfringement.

The Blair patent, of which plaintiff is assignee, relates to the control of large roundworm infections of poultry and domestic animals. The patent covers veterinary therapeutic agents or anthelmintics (for expelling or destroying worms), comprising an orally ingestible, nontoxic substance having as an active ingredient a cadmium compound.

Defendant's use of cadmium anthranilate as an anthelmintic for hogs grew out of a number of experiments by Dr. James E. Guthrie, a former employee of the United States Government Bureau of Animal Industry. Dr. Guthrie developed his work independently and without knowledge of the application of Dr. Blair. On June 25, 1957, United States Patent No. 2,797,182 was issued to Dr. Guthrie and the Blair patent was cited against the issuance.

The specification of the Blair patent makes the following statements and res-

1. The parties will be denominated as in the court below.

ervations of rights under the patent which are material here:

"The effectiveness of my compositions is believed to be due to the cadmium portion of the various compounds, * * *

* * * * * *

"Since the anthelmintic activity of my compositions is essentially due to the cadmium portion of the various compounds employed, my invention has a considerable amount of flexibility and permits the use of a wide variety of cadmium compounds. I prefer to employ those cadmium compounds that are readily available and less expensive in as much as economy is one of the important factors affecting the usefulness of my compositions.

"Thus, in the preparation of my medicated feed compositions, I prefer to use the cadmium compounds such as cadmium oxide, cadmium chloride, cadmium bromide or cadmium sulfate because of their cheapness and their availability. It is desired to emphasize, however, that I can employ any cadmium compound which can be used to provide an effective concentration of cadmium without producing a toxic effect. Among such cadmium compounds are cadmium penta-chlorophenate, cadmium naphthenate, cadmium ortho-phenylphenate, cadmium carbonate, cadmium hydroxide, cadmium orthophosphate, cadmium silicate, cadmium chloro-ortho-phenylphenate, cadmium 2, 4-dichloro-ortho-phenylphenate, cadmium acetate, cadmium ammonium fluoride, cadmium arsenate, cadmium borate, cadmium chlorophosphate, cadmium fluoride, cadmium fluosilicate, cadmium metaphosphate, cadmium nitrate, cadmium oxalate, cadmium perchloriate, cadmium phosphate, cadmium sulfide, cadmium sodium chloride, cadmium stannate, cadmium iodide, cadmium stearate, cadmium salicylate, and the like. * * "

The specifications also give 21 examples of methods of preparing the therapeutic agents under the proposed patent. Four of these examples recommend a mixture of cadmium chloride with the feed and the other seventeen examples recommend a mixture of cadmium oxide with the feed. The specification then states:

"In the foregoing examples, the particular cadmium compounds employed may be replaced by an equivalent quantity of any one or combination of the cadmium compounds mentioned previously as being suitable for use in my veterinary therapeutic feed compositions.

* * * * * *

"The cadmium concentrations in my swine feed mixtures have been varied from 0.003% to about 0.1%."

Typical of the claims in suit is Claim 9, which reads as follows:

"A process for killing large roundworms in swine infected therewith which comprises contacting the roundworms with a cadmium compound by feeding said swine over a period of at least 24 hours, but not over a period sufficient to produce serious toxic effects to the swine, a swine feed containing a cadmium compound in a quantity to provide a cadmium concentration of about 0.015%."

Certain material facts in the case are undisputed. While in the specifications Dr. Blair listed some thirty compounds of which he claimed the exclusive use, only cadmium oxide, cadmium chloride, and cadmium compound P-171 were tested by Dr. Blair before the application for the patent was filed. Only two compounds, cadmium oxide and cadmium chloride, were tested by Dr. George R. Burch with reference to the patent application. Both Dr. Blair and Dr. Burch admitted that they did not know what cadmium compounds in their anthelmintics named in the patent were safe, effective and reliable. It is shown that certain cadmium compounds, including a list of thirteen summarized

and testified to by Dr. Guthrie, caused loss of weight. It was shown that the use of cadmium in swine feed causes a residue to be left in the meat which may be harmful. No evidence was presented that plaintiff tested this feature of the problem.

The District Court found as a fact that an anthelmintic for swine must be safe, effective, reliable, palatable and economical. As to safety, effectiveness, reliability this conclusion was concurred in by plaintiff's experts. The record supports the District Court's finding. These features constitute the common quality which must exist in these numerous related compounds if the claims in suit are to avoid the vice of overclaiming and consequent invalidity. Libbey-Owens-Ford Glass Company v. Celanese Corporation of America, 6 Cir., 135 F.2d 138; American Chemical Paint Company v. Firestone Steel Products Company, 6 Cir., 117 F.2d 927. The court also determined, based upon substantial evidence, that some cadmium compounds have been found not to meet the test above stated and that at least one compound caused instant death. These facts brought the case squarely within the doctrine of Libbey-Owens-Ford Glass Company v. Celanese Corporation of America, supra, and Corona Cord Tire Company v. Dovan Chemical Corporation, 276 U.S. 358, 48 S.Ct. 380, 72 L.Ed. 610, which hold that claims to the exclusive use of a large group of related compounds unsupported by proof that all have a common quality rendering each useful in the process patented are too broad and therefore claims for their exclusive use cannot be sustained.

Plaintiff could not secure the exclusive right to use the group of cadmium compounds listed without showing that all of them had some general quality which made them effective as anthelmintics. The compounds listed in the specifications do not react uniformly in respect to their effectiveness in carrying out the purpose of the patent. It was shown that a number of them do not achieve the inventive concept. Hence, the claims for their exclusive use cannot be sustained. The Incandescent Lamp Patent, 159 U.S. 465, 472, 16 S.Ct. 75, 40 L.Ed. 221; American Chemical Paint Company v. Firestone Steel Products Company, supra.

The District Court made detailed and careful findings based upon extensive oral testimony as well as written summaries of testimony. We deem it unnecessary to discuss further a case given so thorough consideration by the trial court.

The judgment is affirmed upon the ground and for the reasons stated in the memorandum opinion, findings of fact and conclusions of law of the District Court.