Clyde M. NOLL and S. Joseph Fortunato,
as Trustees, Plaintiffs-Appellants,

v.

The O. M. SCOTT & SONS COMPANY,
Defendant-Appellee.

Nos. 71–1518, 71–1519.

United States Court of Appeals,
Sixth Circuit.

Sept. 27, 1972.

296

Stanley L. Amberg and William F. Kilgannon, New York City, for Noll and Fortunato; Richard Whiting, Davis, Hoxie, Faithfull & Hapgood, Alfred H. Hemingway, Jr., New York City, on brief; Taft, Stettinius & Hollister, Robert T. Keeler, Cincinnati, Ohio, James O. Seymour, Vorys, Sater, Seymour & Pease, Columbus, Ohio, of counsel.

John D. Nies, Arlington, Va., for O. M. Scott & Sons Co.; Richard D. Multer, Strauch, Nolan, Neale, Nies & Kurz, Arlington, Va., on brief; Richard J. Brentlinger, Gingher & Christensen, Columbus, Ohio, of counsel.

Before PHILLIPS, Chief Judge, CELEBREZZE, Circuit Judge, and McALLISTER, Senior Circuit Judge.

PHILLIPS, Chief Judge.

This is an appeal and cross-appeal from a judgment for defendant in a patent infringement action. A brief outline of the facts is essential to an understanding of the issues presented to this court. Reference is made to the comprehensive opinion of District Judge Joseph P. Kinneary reported at 169 U.S.P.Q. 336 (1971) for a more complete discussion of the facts.

The patent in suit, No. 2,678,625, was granted on May 11, 1954, to Arthur Schwerdle as assignor to Vineland Chemical Company on an application filed in July 1951. It is directed to selective post-emergent herbicides, describing and claiming a method of destroying crabgrass while doing little or no harm to desirable grasses. Schwerdle discovered the selective herbicidal qualities of disodium methyl arsonate (DSMA) in 1949. In 1950 and 1951 he offered samples of DSMA to O. M. Scott and Sons for testing and evaluation. At that time he identified the samples only as an organic arsenic compound. Scott was impressed with the samples, requested more material for further testing, and began consideration of a dry formulation of the material for commercial use.

In 1954 Schwerdle began marketing "Crab-E-Rad," a wet spray formulation of DSMA. In response to Scott's inquiry, Schwerdle disclosed the DSMA was the herbicidally active ingredient of Crab-E-Rad and was identical with the samples furnished Scott since 1950. Scott's plan to market a dry formulation of DSMA became fixed in 1955. Inquiry was made of Schwerdle as to his ability to supply Scott with substantial quantities of DSMA. Shipments to Scott commenced in April 1956 and Scott began marketing its dry formulation under the name "Clout" by early summer. Scott purchased its DSMA requirements from Schwerdle until March 1957, paying patent royalties of $0.555 per pound.

Thereafter, purchases were made from others without payment of any royalties.

We digress from the above chronology to discuss related events. Schwerdle had been an officer and employee of American Research Associates (ARA) from mid-1945 through August 1949. A co-worker accidentally had discovered the selective herbicidal qualities of phenyl mercuric acetate, an organic mercury compound. Schwerdle was placed in charge of a program for evaluation of organic arsenic compounds for similar activity. He procured several of such compounds and forwarded them to Rhode Island University in May 1949 for testing. One of the compounds sent was DSMA. Schwerdle left ARA in August 1949 to form a partnership with his wife under the name Vineland Chemical Company. The test results from the University were not reported to ARA until November 1949. Schwerdle, unaware of the University test results, undertook his own testing of DSMA in September 1949. The results of these tests showed the chemical's effectiveness, culminating in the patent at issue.

In November 1955 ARA asserted ownership of the patent by virtue of Schwerdle's employment. An action was brought against Schwerdle in the United States District Court for the District of New Jersey, alleging that ARA was the equitable owner of the patent and demanding assignment of the patent to it. In January 1959, a lengthy opinion was filed, disposing of the litigation, which had been extremely bitter because of personal animosity between the litigants. The court in essence found that both parties had been guilty of grossly inequitable conduct and refused to lend the aid of its equitable powers to either of them. In an unusual turn of events, the court was persuaded by counsel to withdraw and impound its opinion, permitting the parties to stipulate to dismissal without an adjudication on the merits but with prejudice, in order to enter a settlement agreement. The

agreement assigned the patent to a trust, with counsel for the parties designated as trustees, and granted each of the parties nonexclusive licenses. The trustees were to license the patent to responsible formulators, accounting to the parties for royalties received on an equal basis. The trustees carried out the terms of the agreement, licensing formulators of DSMA and other organic arsenic compounds.

We return to the present suit. The trustees filed this patent infringement action in 1962, alleging that Scott had directly infringed and actively induced infringement of the Schwerdle patent through its marketing of Clout. Scott interposed the typical array of defenses: non-infringement; invalidity by reason of lack of novelty, obviousness, vagueness and overbreadth; and unenforceability by reason of laches, misuse and lack of title. By final pretrial order the issues were reduced to the infringement of claim 2 and the defenses of overbreadth and vagueness, obviousness, lack of novelty and misuse. Following an extensive trial, Judge Kinneary found that claim 2 was invalid for overclaiming, but valid with respect to the asserted lack of novelty, vagueness and obviousness; that no misuse had been proved; and that the claim would have been infringed if valid.[1]

The trustees appeal from the holding of invalidity. Scott cross-appeals from the holding of infringement and enforceability.

## I. VALIDITY

Claim 2, construed to include all the limitations of generic claim 1 from which it depends, 37 C.F.R. § 1.75(c), reads as follows:

"The method of selectively controlling the growth of crabgrass which comprises applying to an area containing crabgrass a composition comprising a mixture of at least one arsenic compound selected from the group con-

---

1. This court commends such alternative findings by District Courts as a desir-

able technique to facilitate disposition of all issues in a single appeal.

sisting of arsonic acids and having the formula:

$$R-\overset{\overset{\displaystyle O}{\|}}{\underset{\underset{\displaystyle OH}{|}}{AS}}-OH$$

where R is methyl, and salts thereof; and an inert diluent therefor, in a concentration and amount sufficient to destroy crabgrass but insufficient to destroy material quantities of the useful grasses and plants."

The structural formula of the claim represents methyl arsonic acid. The "salts" of this acid are those chemical compounds in which one or both of the hydrogen ions, represented in the formula by the symbol "H", are replaced by another ion. DSMA is one of the sodium salts in which both hydrogen ions are replaced by sodium ions. In the other sodium salt (monosodium methyl arsonate) only one hydrogen is so replaced. Because of the vast number of ions capable of replacing hydrogen in methyl arsonic acid, there are literally thousands of salts of this acid. Thus, the number of "mixture[s] of at least one arsenic compound selected from the group consisting of [methyl] arsonic acid, . . . and salts thereof" is virtually unlimited.

Scott introduced into evidence the results of ex parte tests of various organic arsenic compounds conducted in 1962. Judge Kinneary found that these tests "demonstrate[d] that copper methyl arsonate and phenyl mercury methyl arsonate are inoperable compounds because they were not selective." 169 U.S.P.Q. at 357. Bound by what it comprehended to be the *per se* rule of this Circuit that inoperativeness of some subject matter literally within the scope of the claim mandated a holding of invalidity, the District Court held claim 2 invalid. The court relied on the line of Sixth Circuit cases beginning with Kalle & Co. v. Multazo Co., 109 F.2d 321, modified, 110 F.2d 814 (1940). As stated in *Kalle*:

"Where within a general classification disclosed by the claims, are com-

pounds which do not answer the description of the specification, even though there be a general quality common to them all, yet if there be no common quality in respect to their effectiveness in achieving the inventive concept, claims for their exclusive use cannot be sustained." 109 F.2d at 325.

The trustees seek to distinguish this line of cases on the ground that they presented situations where the alleged infringement involved subject matter within the scope of the asserted generic claim but not specifically described in the specification. It is urged that the *Kalle* rule is inapplicable to cases where the infringer has appropriated the invention both as broadly claimed and specifically described, and that claim 2 should be construed in light of the specification to embrace only operative methyl arsonates.

We are unable to adopt this distinction. The first difficulty in this approach lies in its application. It is often stated that the claims define the invention and that limitations in the specification will not be incorporated into unambiguous claims to uphold their validity. *See* Graver Tank & Mfg. Co. v. Linde Air Prod. Co., 336 U.S. 271, 277, 69 S.Ct. 535, 93 L.Ed. 672 (1949) (*Graver I*). Yet it is also stated "that claims are to be construed in the light of the specifications and both are to be read with a view to ascertaining the invention." United States v. Adams, 383 U.S. 39, 49, 86 S.Ct. 708, 713, 15 L.Ed.2d 572 (1966). We have considered the numerous cases on this issue and find the limitation-construction distinction to be unworkable. For example, in *Graver I*, the Court refused to "limit" claims broadly reciting metallic silicates to those operative metallic silicates set forth in the specification, while in *Adams*, claims omitting any recitation of an electrolyte were "construed" to require a water electrolyte. *See also* Sun Ray Gas Corp. v. Bellows—Claude Neon Co., 49 F.2d 886, 888–889 (6th Cir. 1931). Further, even if we were to adopt

this distinction we are of the view that the present case is indistinguishable from *Graver I*.

The trustees further urge that the rule applied by the District Court is logically inconsistent with the doctrine of equivalents. Under that doctrine, subject matter not literally embraced by the claim language will be held to be an infringement if it "do[es] the same work in substantially the same way, and accomplish[es] substantially the same result." Graver Tank & Mfg. Co. v. Linde Air Prod. Co., 339 U.S. 605, 608, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950) (*Graver II*). The patent specification in the *Graver* cases described welding fluxes containing a major portion of one of nine specific metallic silicates, including manganese silicate. Some claims were directed specifically to alkaline earth metallic silicates, others generically to metallic silicates. The former were held valid and the latter invalid for overclaiming, the evidence showing that some metallic silicates not named in the specification were inoperative as fluxes. *See* Linde Air Prod. Co. v. Graver Tank & Mfg. Co., 167 F.2d 531 (7th Cir. 1948). As noted above, the holding of invalidity of the generic claims was upheld in *Graver I*. The infringer used a flux containing manganese silicate, not an alkaline earth metallic silicate. It was held that the valid specific claims were infringed by application of the doctrine of equivalents on the ground that manganese silicate was equivalent to an alkaline earth metallic silicate. This ruling was upheld in *Graver II*. Thus as we read the two *Graver* decisions, overly broad claims may not be narrowed to the limitations set forth in the specification, but narrow claims may be broadened to embrace "equivalent" subject matter. This result was criticized by Justices Black and Douglas who would have limited the doctrine of equivalents to cases involving mere colorable differences between the claims of the patent and the accused device.[2] See *id.* at 612–618, 70 S.Ct. 854 (dissenting opinions).

While we disagree with the foregoing contentions urged by the trustees, we find that the *Kalle* rule was inapplicable to the claim in issue. The *Kalle* progeny are cited in the decision of Judge Kinneary and, with the exception of Pemco Prod., Inc. v. General Mills, Inc., 261 F.2d 302 (6th Cir. 1958), will not be considered individually. These cases, apart from the above-noted exception, were decided under the law which predated the enactment of the statutes which now are controlling. Title 35 of the United States Code, revising and codifying the patent laws, was enacted into law by the Act of July 19, 1952, ch. 950, § 1, 66 Stat. 792. It became effective January 1, 1953. *Id.*, § 4(a), 66 Stat. 815.

The 1952 Act codified R.S. § 4888 (formerly 35 U.S.C. § 33) as the first two paragraphs of 35 U.S.C. § 112. The Act added as a third paragraph to § 112, the following:

> "An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof."

We are of the view that this statutory amendment modified the *Kalle* rule as to claims falling within its scope. Claim 2 in the present case is such a claim, in that it is for a combination, and the

---

2. The question of the continued vitality of the doctrine of equivalents was last presented to the Supreme Court by the United States Department of Justice and the American Patent Law Association as *amicii* in Standard Industries, Inc. v. Tigrett Industries, Inc., 397 U.S. 586, 90 S.Ct. 1310, 25 L.Ed.2d 590, rehearing denied, 398 U.S. 944, 90 S.Ct. 1835, 26 L.Ed.2d 282 (1970), aff'g 411 F.2d 1218 (6th Cir., 1969). *See* 1970 Am.Pat. L. Ass'n Bull. 27–33. The Court did not reach the issue, affirming the decision below 4–4. Justices Black and Douglas dissented on other grounds. 397 U.S. at 586–588, 90 S.Ct. 1310.

function of the element of methyl arsonic acid and salts thereof is specified to be the selective destruction of crabgrass. *See* In re Barr, 444 F.2d 588, 593–594 (C.C.P.A. 1971); In re Fuetterer, 319 F.2d 259, 265 (C.C.P.A. 1963).

The statute thus requires this claim to "be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof." The inoperative methyl arsonates set out in the test report are not embraced by claim 2 since they are not equivalents of the disclosed methyl arsonates in that they do not "do the same work in substantially the same way, and accomplish substantially the same result." *See Graver II, supra,* 339 U.S. at 608, 70 S.Ct. at 856. This court in Pemco Products, *supra,* 261 F.2d 302, had no occasion to consider the effect of the 1952 Act on the *Kalle* rule as that case involved claims not within the scope of the third paragraph of 35 U.S.C. § 112. *See id.* at 303. Further, certain compounds specifically disclosed in the specification were inoperative. *See id.* at 303–304.

Accordingly, the decision of the District Court as to invalidity is reversed.

## II. INFRINGEMENT

Claim 2 is silent as to the method of application and the number of applications of DSMA to turf. The specification describes spraying a water solution of the chemical in an appropriate concentration. Schwerdle disclosed DSMA to Scott only in the context of wet spray application. Scott's technology has been directed toward the production of dry products compatible with application by means of a lawn spreader. It is felt by Scott that this method of application enables the non-professional home user to apply its products with maximum convenience, uniformity and consistency. Accordingly, Scott's technical efforts with DSMA involved adapting it to a dry granular formulation. Clout, the fruit of these efforts, used expanded vermiculite as a carrier for DSMA, hexelene glycol as a sticking agent to adhere the DSMA to the vermiculite, a wetting or surface active agent to improve herbicidal action on waxy leaved weeds, and a dye to give the product the desired color. Clout is applied in multiple applications spaced about one week apart.

The District Court found that Scott had actively induced infringement of the Schwerdle patent through the sale and promotion of Clout.[3] Scott seeks to avoid liability on the grounds that Clout's multiple application, dry formulation is fundamentally different from the single application, wet spray disclosed by Schwerdle, noting their own Renner patent on Clout, granted by the Patent Office after consideration of the Schwerdle patent.

As found by the District Court and amply established by the stipulations and evidence, at the time of the Schwerdle invention the use of a dry granular herbicidal formulation including a herbicide adhered to vermiculite by a sticking agent and of a wetting or surface active agent to improve spreading and penetration of herbicides applied to waxy leaved weeds were publicly known. It similarly was known that multiple applications of a reduced amount of herbicide gave satisfactory weed control with less turf injury than a single larger application.[4]

3. Claim 2 is directed to the method of crabgrass control. The mere sale of Clout cannot constitute direct infringement since such conduct is not the making, using or selling of the patented invention which is the predicate for direct infringement set forth in 35 U.S.C. § 271(a). However, if the ultimate users of Clout practice the claimed method of applying Clout to their lawns in accordance with Scott's directions, Scott has "actively induce[d] infringement . . . [and is] liable as an infringer." 35 U.S.C. § 271 (b).

4. Scott's contention that such findings were made with regard solely to the issue of invalidity is wholly without merit. Judge Kinneary's opinion clearly states that "[f]indings of fact made on the issue . . . of validity which are relevant to the issue of infringement are incorporated [t]herein." 169 U.S.P.Q. at 363.

These findings relate to the question of equivalence of Clout to the wet spray disclosed by Schwerdle. The rule of construction set forth in 35 U.S.C. § 112 has been discussed in Section 1, *supra.* Further,

> "[W]here a [process] is so far changed in principle from a patented [process] that it performs the same or a similar function in a substantially different way, but nevertheless falls within the literal words of the claim, the doctrine of equivalents may be used to restrict the claim and defeat the patentee's action for infringement." *Graver II, supra,* 339 U.S. at 608–609, 70 S.Ct. at 856 (citation omitted).

The appropriate inquiries on the equivalence issue are set forth in *Graver II* as follows:

> "What constitutes equivalency must be determined against the context of the patent, the prior art, and the particular circumstances of the case. Equivalence, in the patent law, is not the prisoner of a formula and is not an absolute to be considered in a vacuum. It does not require complete identity for every purpose and in every respect. In determining equivalents, things equal to the same thing may not be equal to each other and, by the same token, things for most purposes different may sometimes be equivalents. Consideration must be given to the purpose for which an ingredient is used in a patent, the qualities it has when combined with the other ingredients, and the function which it is intended to perform. An important factor is whether persons reasonably skilled in the art would have known of the interchangeability of an ingredient not contained in the patent with one that was." *Id.* at 609, 70 S.Ct. at 856–857.

■■ The District Court found that the sole active ingredient in Clout was DSMA and that the other constitutents performed well known functions to adapt DSMA to a dry formulation and improve herbicidal action. These findings, not clearly erroneous, must be sustained. Scott's own patent, while probative of the issue, is not dispositive. It has long been recognized that an improver operating under a subsequently issued patent "can not appropriate the basic patent of another and that the improver without a license is an infringer and may be sued as such." Temco Elec. Motor Co. v. Apco Mfg. Co., 275 U.S. 319, 328, 48 S.Ct. 170, 173, 72 L.Ed. 298 (1928). Accordingly, we affirm the District Court in the issue of infringement.

## III. MISUSE

■ Scott contends that the Schwerdle patent has been misused in several respects, thereby rendering it unenforceable. It is asserted that the trust agreement was part of a concerted action between competitors to restrain competition in the sale of DSMA and exploitation of the Schwerdle invention and that the trustees extended the patent beyond its lawful scope. We note at the outset that the strong public policy underlying the misuse doctrine allows Scott to interpose this defense without allegation or proof that Scott was the victim of any misuse. *See* Morton Salt Co. v. G. S. Suppiger Co., 314 U.S. 488, 494, 62 S.Ct. 402, 86 L.Ed. 363 (1942); Kolene Corp. v. Motor City Metal Treating, Inc., 440 F.2d 77, 84–85 (6th Cir.), cert. denied, 404 U.S. 886, 92 S.Ct. 203, 30 L.Ed.2d 169 (1971).

■ Judge Kinneary found that both Vineland and ARA had colorable claims to ownership of the Schwerdle patent and that the settlement agreement was entered into in reasonable compromise of these claims which had been asserted in good faith. Had the title contest been a sham to cover a naked agreement between competitors to restrict the licensing of a patent owned by one of them, the agreement would be subject to rigid scrutiny. *See* United States v. Besser Mfg. Co., 96 F.Supp. 304 (E.D.Mich. 1951), aff'd, 343 U.S. 444, 72 S.Ct. 838, 91 L.Ed. 1063 (1952). We are unwilling on this record, however, to hold the agreement to have been a *per se* misuse.

Scott further asserts that the agreement in terms and operation was used by Vineland and ARA to suppress competition in the manufacture and sale of DSMA. The District Court found that the agreement and form patent licenses granted thereunder contained "affirmative provisions which assure free competition," 169 U.S. P.Q. at 349, and that the trust in fact was not used to restrain competition. *Id.* at 350. We agree with the findings of Judge Kinneary.

■ The second type of misuse asserted is that the trustees collected royalties for uses of DSMA other than crabgrass control and for uses of calcium propyl arsonate (CPA) and ammonium methyl arsonate (AMA), chemicals alleged to be outside the scope of the Schwerdle patent. The patent licenses granted by the trustees contained a clause establishing a presumption that DSMA sold by the licensee would be used to practice the patented method. The evidence showed that when the trust agreement was entered into and the form licenses established, the only commercial use for DSMA was in crabgrass control. Some three years later, a substantial part of the DSMA sold was used to control other weeds. Scott urges that the presumptive clause was used to collect royalties from the latter non-infringing uses. The proofs at trial clearly show otherwise. A licensee was free either to obtain a royalty refund upon certification of sale for control of other weeds or purchase DSMA ex-royalty, making royalty payments only upon sale of DSMA for crabgrass control. The record is devoid of any evidence that the trustees knowingly have collected royalties for non-infringing uses of DSMA.

With respect to CPA and AMA, Scott urges that the trustees are estopped to assert infringement of the Schwerdle patent by the use of these chemicals. Estoppel is predicated on representations made to the Patent Office by Schwerdle during prosecution of applications for patent on herbicidal uses of AMA and CPA.

AMA is a species of methyl arsonate within the scope of the generic claims of the Schwerdle patent but not specifically described in the specification thereof. In response to rejections of claims to AMA in the later filed application on the ground of unpatentability over the patent in suit, Schwerdle argued that the claimed AMA salts were markedly and unexpectedly superior to those disclosed in the patent. It is Scott's position that these representations estop the trustees to assert that AMA is within the scope of the patent in suit. It is our view that Scott has fallen far short of the mark. Misuse of this type is not made out unless it is shown that AMA is without the scope of the Schwerdle patent and that the trustees knowingly extracted royalties for the uses thereof in the face of this lack of coverage. The record shows neither.

■ It is clear that a specific improvement patent may be granted in the face of a basic patent which generically but not specifically describes the claimed subject matter of the later filed application where the species claimed possesses properties unexpectedly superior to the genus disclosed. *See* In re Petering, 301 F.2d 676, 683 (C.C.P.A. 1962); *cf.* In re Arkley, 455 F.2d 586 (C.C.P.A. 1972). Further, the claimed subject matter of the Schwerdle patent is not limited to the specifically disclosed embodiments thereof. Broad claims may include subject matter not so embraced. *See* Maxon v. Maxon Constr. Co., 395 F.2d 330, 334–335 (6th Cir. 1968); 35 U.S.C. § 112. It is thus clear that Schwerdle's representations [5] to the Patent Office in connection with the later filed application, if true [6] are in no way inconsistent with

5. We assume without deciding that the trustees are chargeable with Schwerdle's conduct in the prosecution of his own patent application not controlled by the trustees or within the scope of the trust agreement.

6. There was no proof offered as to the truth or falsity of the representations. If

the trustees' assertion of the Schwerdle patent against formulators of herbicides using AMA as the active ingredient.

▮ The same reasoning supports the conclusion that extraction of royalties for CPA was not a misuse. On the basis of Schwerdle's representations that CPA was unexpectedly effective as a pre-emergent herbicide (it destroyed crabgrass before germination and surface appearance) in addition to its known post-emergent effect, he was granted a patent on this method of using CPA. The evidence showed that due to the unpredictability and variability in the time of germination and surface appearance of crabgrass, the user will apply CPA after some of the weed has emerged, thereby practicing the method of the Schwerdle patent. Thus, although calcium arsonates are described briefly in the Schwerdle specifications, representations as to unexpected pre-emergence herbicidal activity are not inconsistent with an assertion of infringement by post-emergent application.

Since the evidence shows that the trustees had at least a colorable claim of infringement by the use of CPA and AMA,[7] the District Court is affirmed on the issue of misuse.

Affirmed in part, reversed in part, and remanded for a determination of the amount of damages.

McALLISTER, Senior Circuit Judge (dissenting).

I respectfully dissent from the opinion of the Court for the reason that I am of the view that the decision of the District Court on the issue of validity should be affirmed.

The basis of this Court's opinion is that under the language of the third paragraph of 35 U.S.C.A., Sec. 112, the rule as stated in Kalle & Co. v. Multazo Co., 109 F.2d 321, 325 (C.A.6), is not applicable to the claim in issue.

In *Kalle,* the Court held:

"Where within a general classification disclosed by the claims, are compounds which do not answer the description of the specification, even though there be a general quality common to them all, yet if there be no common quality in respect to their effectiveness in achieving the inventive concept, claims for their exclusive use cannot be sustained."

Under the *Kalle* rule, the holding of the District Court that the claim in issue was invalid, it is agreed, should be sustained. However, under the prevailing opinion of this Court it is said that the *Kalle* case predated the enactment of the third paragraph of 35 U.S.C.A., Sec. 112, which provides:

"An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof."

It is the foregoing paragraph of the statute that the majority opinion holds modified the rule in the *Kalle* case and that, accordingly, the District Court's holding that the claim in question is invalid, should be reversed.

The above section of the statute was never thought of by plaintiffs-appellants as being a ground for reversal of the District Court's holding of invalidity. It was never considered in their brief on appeal; and it was only after the case was argued and our Court asked for their views on this heretofore-unmentioned question that appellants, for the

---

they were false, such conduct could only invalidate the patents in whose application the assertions were made. These patents are not owned or controlled by the trustees. There can be no defense based on " 'missue in the air.' * * * The misuse must be of the patent in suit." Kolene Corp. v. Motor City Metal Treat-

ing, Inc., *supra,* 440 F.2d at 84. This footnote is not to be construed as any indication that this court regards Schwerdle's representations as false.

7. We need not and do not pass on the question of whether such uses are in fact infringements of the patent.

first time, relied upon the third paragraph of 35 U.S.C.A., Sec. 112, for reversal of the judgment of the District Court.

I cannot bring myself to agree with the contentions now made by plaintiffs-appellants, and with the conclusions of the Court in this regard. Rather, I am of the view that the judgment of the District Court should be affirmed.

It appears to me that whether claims are drawn in the form prescribed by the third paragraph of 35 U.S.C.A., Sec. 112, or whether they are drawn in another form, they are equally subject to invalidation for overclaiming.

To adopt, in part, the language of Judge Simons in Kalle & Co. v. Multazo & Co., *supra*, "[o]ut of a maze of confusing scientific discussion in briefs and record, there yet emerges with reasonable clarity to the understanding imperfectly schooled in chemical science," the fact that the patent in question is invalid for claiming inoperable compounds.

There was evidence, introduced by defendant, that the claim in question covered thousands, or possibly hundreds of thousands, of compounds; and defendant further produced evidence that the ten compounds, embraced in the claim, which it tested, were not effective for the purpose set forth. At the trial there was evidence that several other compounds, embraced in the claim, had been proven effective. The District Court held that there was ample evidence that the compounds of copper methyl arsonate and phenyl mercury methyl arsonate were not effective, although these compounds were embraced within the claim in issue; and the Court, accordingly, held that the claim was invalid. Under the prior decisions of this Court, Kalle v. Multazo, *supra*; Libby-Owens-Ford Glass Co. v. Celanese Corporation of America, 135 F.2d 138, and Patrol Valve Co. v. Robertshaw-Fulton Controls Co., 210 F.2d 146, it is my view that the claim in issue is invalid, and that the judgment of the District Court should be affirmed for the reasons set forth in the opinion of Judge Kinneary.